UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ISAAC DENEL MEEKS,

                              Criminal No. 10-cr-20388

           Petitioner,

v.                        Judge Linda V. Parker

UNITED STATES OF AMERICA,

           Respondent.

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

Meeks was arrested in 2010 after agents seized from Meeks's closet more than a pound of heroin and an assault style rifle, 88 rounds of ammunition loaded in the rifle's drum magazine, and another 500 rounds in boxes.  He went to trial and was convicted of conspiring to distribute controlled substances, possession with the intent to distribute heroin, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a felon. The trial court sentenced Meeks to a total of 181 months' imprisonment—concurrent terms of 121 months for each of the drug counts, another concurrent term of 120 months for the felon-in-possession count, and a mandatory consecutive

term of 60 months for the § 924(c) count.  (R. 647: Judgment, PageID 8090).

Meeks began serving his current sentence on July 16, 2013. He is currently incarcerated at United States Penitentiary Lewisburg, a facility that has not had an inmate test positive for the virus. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 13, 2020, these directives have already resulted in at least 2,471 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Meeks does not qualify for compassionate release. Because Meeks has not sought compassionate release from the Bureau of Prisons based on Covid-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his Covid-19-based argument until he exhausts his administrative remedies. Nor, in any event, does Meeks satisfy the statutorily mandated criteria for compassionate release. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Meeks's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Meeks's age and medical conditions do not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Meeks's age does not put him at higher risk; he's 52. Nor does his health; he does not even claim it is compromised. Instead, he simply speculates that the Bureau of Prisons "cannot provide adequate medical care." (R.830: Compassionate Release Motion, PageID 12171). This type of speculation is insufficient.

Meeks has not addressed where he would return, the suitability of the residence for home confinement, who else he would live with, or how the household would abide by social distancing requirements to reduce

the spread of COVID-19. In other words, he has failed to demonstrate that his release would not endanger the community.

Beyond this, Meeks's offense involved heavily armed heroin and cocaine trafficking and he has a prior firearm conviction. This combination also shows he is a danger to the community, *see* USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

## Background

Meeks was involved in a broad drug conspiracy with Lamonte Watson and others in Flint, Michigan. During the summer of 2010, the FBI began court authorized interception of calls to and from Watson's phone. R. 586: Trial Tr., PageID 3546). In a series of calls, Meeks and Watson arranged for Meeks to bring new customers to Watson, including his nephew. (R. 692-2: Call Tr., PageID 11358). Watson explained on the wiretap that he would allow Meeks to "work off something" by bringing in this new customer. (R. 692-2: Call Tr., PageID 11338, 11358). Later, in coded language, Meeks negotiated the sale of the kilogram of cocaine to his nephew. (*Id.*). After confirming

the cocaine's quality and availability, Watson and Meeks settled on a price of $32,500 for the kilo.  (*Id.*).

A few days later, the FBI executed 12 search warrants in and around Flint—including at Meeks's house on Garden Street.  (R. 584: Trial Tr., PageID 3555; R. 692–2: Call Tr., PageID 11348; R. 588: Trial Tr., PageID 4442).  In the master bedroom closet of the house on Garden Street, the agents seized over one-half of a kilogram of heroin in separate packages.  (R. 589: Trial Tr., PageID 4676–78). The agents also discovered three blenders, each coated with a powdery residue, as well as common cutting agents for heroin.  (R. 588: Trial Tr., PageID 4446–52).  Blenders are commonly used to break hard chunks of heroin into powder and to blend that powder with a cutting agent.  (R. 587: Trial Tr., PageID 4260).  In addition, the agents found an AK-47 style assault rifle, a detached drum style magazine for the AK-47 loaded with 88 rounds of ammunition, another 500 rounds of ammunition for the AK-47, and a loaded semi-automatic handgun.  (R. 588: Trial Tr., PageID 4443–44, 4452–68).  In a separate office, the agents found photographs of Meeks holding the guns, along with paperwork demonstrating that Meeks used the home.  (R. 588: Trial Tr., PageID 4458–69).

A jury convicted Meeks of conspiracy to distribute more than a kilogram of heroin and five kilograms to cocaine, possession with the intent to distribute more than 100 grams of heroin, possession of firearms in furtherance of drug trafficking crimes, and possession of a firearm by a felon. (PSR ¶ 12). Meeks had an earlier conviction for attempted carrying a concealed weapon and the combination of this criminal history and offense conduct resulted in a guideline range of 121–151 months for the drug counts, consecutive to the five-year mandatory sentence for the conviction for possessing a firearm in furtherance of a drug trafficking crime.  (R. 651: Sent. Tr., PageID 8119).   The district court sentenced Meeks to a total of 181 months' imprisonment—concurrent terms of 121 months for each of the drug counts, another concurrent term of 120 months for the felon-in-possession count, and a mandatory consecutive term of 60 months for the § 924(c) count.  (R. 647: Judgment, PageID 8090).

Meeks began serving his prison sentence on July 16, 2013 and is currently incarcerated at United States Penitentiary Lewisburg. He is 52 years old, and his projected release date with credit for good time is March 31, 2023. He has not claimed to have any medical conditions.

Nor has he exhausted his administrative remedies with BOP.

Nevertheless, Meeks has asked this Court for compassionate release.

## Argument

## I.     The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

### A.     The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until May 18, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized.

7

Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). And the movement of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the

number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

## B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).

The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2400 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to

release conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate

for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of

Prisons."). It is especially true now, given the Bureau of Prisons'
substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Meeks's motion for compassionate release.

Meeks's motion for a reduced sentence should be denied. A district
court has "no inherent authority . . . to modify an otherwise valid
sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir.
2009). Quite the contrary: a district court's authority to modify a
defendant's sentence is "narrowly circumscribed." *United States v.
Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific
statutory exception, a district court "may not modify a term of
imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those
statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577,
586 (6th Cir. 2001). Compassionate release under 18 U.S.C.
§ 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant
moves for compassionate release, the district court may not act on the
motion unless the defendant files it "after" either completing the
administrative process within the Bureau of Prisons or waiting 30 days
from when the warden at his facility received his request. 18 U.S.C.

§ 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, *and* he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the

15

defendant's history and characteristics, the seriousness of the offense,
the need to promote respect for the law and provide just punishment for
the offense, general and specific deterrence, and the protection of the
public. 18 U.S.C. § 3553(a).

### A. The Court is barred from granting release because Meeks has not exhausted his administrative remedies.

The Court must dismiss Meeks's motion, because he has not satisfied
the exhaustion requirement for compassionate release under 18 U.S.C.
§ 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move
for compassionate release. The First Step Act of 2018 amended the
statute, permitting defendants to move for it too. First Step Act §
603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes
an exhaustion requirement. *Id.* A district court may not grant a
defendant's motion for compassionate release unless the defendant files
it "after" the earlier of (1) the defendant "fully exhaust[ing] all
administrative rights to appeal a failure of the Bureau of Prisons to
bring a motion on the defendant's behalf" or (2) "the lapse of 30 days
from the receipt of such a request by the warden of the defendant's

facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*, 607 F.3d at 1125. The statute "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c) requirements were not considered truly jurisdictional, they would still

17

be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 597.

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL

18

1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020). As one of the those

decisions has explained, the few courts that have excused exhaustion

under § 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-*

*made* exhaustion requirements, not *statutory* exhaustion requirements.

*Mathews*, 2020 WL 1873360, at *2–*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement

apply with even greater force during the COVID-19 pandemic. The

Bureau of Prisons is already responding to the pandemic—not just

through heightened safety measures, but by evaluating its entire prison

population for home confinement. By requiring a defendant to exhaust,

§ 3582(c)(1)(A) gives the Bureau of Prisons the opportunity to gather his

medical documentation and other records, evaluate his request, and

decide in the first instance whether it justifies either compassionate

release or some other form of relief. As the Third Circuit observed:

"Given BOP's shared desire for a safe and healthy prison environment,

. . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement

takes on added—and critical—importance." *Raia*, 954 F.3d at 597.

Meeks did not exhaust his administrative remedies. Indeed, he has

not even begun them. Rather than petitioning the BOP and

demonstrating extraordinary circumstances, he simply wrote the Court

a letter to ask for his release. From that alone, this Court should deny

Meeks's motion.

### B. There are no extraordinary and compelling reasons to grant Meeks compassionate release.

Even if Meeks had exhausted his administrative remedies,

compassionate release would be improper. Compassionate release must

be "consistent with applicable policy statements issued by the

Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the

Sentencing Commission with "describe[ing] what should be considered

extraordinary and compelling reasons for [a] sentence reduction" under

§ 3582(c)(1)(A), as well as developing "the criteria to be applied and a

list of specific examples" for when release is permitted. 28 U.S.C. §

994(t).

Because the Sentencing Commission has fulfilled Congress's

directive in USSG § 1B1.13, that policy statement is mandatory. Section

3582(c)(1)(A)'s reliance on the Sentencing Commission's policy

statements mirrors the language governing sentence reductions under

18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare*

§ 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same

20

language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant

21

compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Meeks does not argue that either his age or his health make him eligible for compassionate release. Instead, he simply claims that the BOP "cannot provide adequate medical care" due to Covid-19. (R.830: Compassionate Release Motion, PageID 12171). This is insufficient. Even assuming that a hypothetical defendant's risk from Covid-19 might make the difference in their eligibility for release under § 1B1.13, Meeks's circumstances do not place him into that category. He is not increasingly vulnerable due to his age, nor does he claim that a medical condition makes him especially vulnerable to the disease, nor is he in a facility that has struggled with the virus. Meeks is simply attempting to use generalized concerns of infection as a pretext for requesting that this Court shorten his significant, and lawful sentence. His request should be denied.

The Covid-19 pandemic by itself does not qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot

independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Meeks and other inmates. Indeed, USP Lewisburg, where Meeks is incarcerated has no inmates that have tested positive for the virus. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

Meeks is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." Meeks was caught with more than a pound of heroin and the Sixth Circuit has routinely affirmed findings of dangerousness for "run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947 (6th Cir. 2010). But Meeks's danger to the community is compounded by the weapons he illegally possessed: an

23

assault style rifle, with a barrel drum and more than 500 rounds of ammunition, and a loaded pistol.

Meeks is also a danger to the community in another way. His prior conduct shows he would be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order. So it is hardly clear that Meeks faces any greater risk of infection in custody than he would if released. Beyond this, Meeks has not offered any prerelease plan—he simply wants to be released, from a facility with no positive tests for Covid-19, to a community that is, tragically, one of a number of areas of the country that are experiencing a true outbreak.  As of today, the State of Michigan has 48,391 confirmed cases, with 4,714 deaths; Genesee County alone has 1,784 confirmed cases, with 227 deaths.[1] In contrast, Union County, Pennsylvania, where Meeks is incarcerated, has only 42 positive cases (with 682 negative test results) and a single death.[2] Meeks's release would not reduce his Covid-19 risk; rather, it would likely increase his

---

[1] *See* State of Michigan Coronavirus Response, https://www.michigan.gov/coronavirus/ (accessed May 13, 2020, at 2:45PM)

[2] *See* State of Pennsylvania Coronavirus Response, County and Zip Code Maps, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Coronavirus.aspx (accessed May 13, 2020, at 3:00PM)

24

risk of contracting—and spreading—the virus. This factor, too,

forecloses relief here.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence

modification based on "extraordinary and compelling reasons,"

compassionate release is not necessarily appropriate. Before ordering

relief, the Court must first consider the factors set forth in 18 U.S.C.

§ 3553(a) and determine whether those factors support release. So even

if the Court were to find Meeks eligible for compassionate release, the

§ 3553(a) factors should still disqualify him.

Meeks's offense was a serious one. The pound of heroin he intended

to distribute would have helped fuel what was then a just-developing

opioid epidemic; an epidemic that continues to plague our country even

now, in the midst of a global pandemic.[3]  Further, he kept his loaded

pistol near his guns, "which is one consideration indicating it was

readily available for use." *United States v. Mendizabal*, 214 Fed.Appx.

---

[3] *See* ABC News, Officials worry of potential spike in overdose deaths amid COVID-19 pandemic, April 15, 2020, https://abcnews.go.com/US/officials-worry-potential-spike-overdose-deaths-amid-covid/story?id=70149746 (accessed May 13, 2020 at 2:45PM)

496, 501 (2006).  And similarly, although the AK-47 itself was unloaded, its magazine was loaded with 88 rounds of ammunition and was located within two feet of the rifle.  (R. 588: Trial Tr., PageID 4454). The nature of this offense alone warrants a serious and continued punishment.

Meeks's history does not suggest otherwise.  He has prior misdemeanor assault convictions and a felony weapons offense. (PSR - ¶¶ 36-39). And within two years of being discharged from the term of probation he received for his weapons offense, Meeks was conspiring to deal drugs and was again in possession of firearms.  Compassionate release in this case would not satisfy the goals of section 3553—even in the context of the Covid-19 pandemic.

### III.  If the Court were to grant Meeks's motion, it should stay the release order pending any appeal by the United States.

If the Court were inclined to grant Meeks's motion, despite the government's arguments above, the government would request that the Court's release order include two provisions. First, the Court should order that he be subjected to a 14-day quarantine before release. Second, the Court should stay its order pending any appeal by the government to the Sixth Circuit. More specifically, the government would request that if the government files a notice of appeal before the

14-day quarantine ends, the Court's order would automatically be stayed through the completion of any appeal proceedings.

## Conclusion

Meeks's motion should be denied.

Respectfully Submitted,

Matthew Schneider
United States Attorney

s/ *Craig Wininger*
Craig Wininger
Assistant United States Attorney
211 W. Fort St. Suite 2001
Detroit, MI 48226
313-226-9569
craig.wininger@usdoj.gov

Dated: May 13, 2020

27

CERTIFICATE OF SERVICE

I hereby certify that on Wednesday, May 13, 2020, I electronically

filed the foregoing document with the Clerk of the Court using the

CM/ECF system.  I further certify that I forwarded a copy of said

document via U.S. First Class mail to:

Isaac Meeks
#44347-039
USP Lewisburg
P.O. Box 100
Lewisburg, PA 17837

<div style="margin-left:40%">

*s/ Craig F. Wininger*
Craig F. Wininger
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Craig.Wininger@usdoj.gov
(313) 226-9569
P57058

</div>