UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                        Criminal No. 10-cr-20388

            Plaintiff,

v.                                      Judge Linda V. Parker

ISAAC DENEL MEEKS,

            Defendant.


## United States' Response Opposing
## the Defendant's Motion for Compassionate Release


Meeks was arrested in 2010 after agents seized more than a pound of heroin, an assault style rifle, 88 rounds of ammunition loaded in the rifle's drum magazine, and another 500 rounds in boxes, all from his closet.  He went to trial and was convicted of conspiring to distribute controlled substances, possession with the intent to distribute heroin, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a felon. The trial court sentenced Meeks to a total of 181 months' imprisonment—concurrent terms of 121 months for each of the drug counts, another concurrent term of 120 months for the

felon-in-possession count, and a mandatory consecutive term of 60 months for the § 924(c) count.  (R. 647: Judgment, PageID 8090).

Meeks began serving his current sentence on July 16, 2013. He is currently incarcerated at United States Penitentiary Lewisburg, a facility that has no current cases of Covid-19. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Meeks does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming a defendant facing a heightened risk from Covid-19 could satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Meeks's conditions—hypertension and obesity—are well controlled or non-permanent, thus, do not.  And Meeks's offense demonstrates that he is a danger to the community, which precludes release under USSG § 1B1.13(2). Finally, the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

2

The Bureau of Prisons has also taken significant steps to protect all inmates, including Meeks, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of October 6, 2020, this process has already resulted in at least 7750 inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Meeks's motion for compassionate release.

## Background

Meeks was involved in a broad drug conspiracy with Lamonte Watson and others in Flint, Michigan. During the summer of 2010, the FBI began court authorized interception of calls to and from Watson's phone. R. 586: Trial Tr., PageID 3546). In a series of calls, Meeks and

3

Watson arranged for Meeks to bring new customers to Watson, including his nephew.  (R. 692-2: Call Tr., PageID 11358).  Watson explained on the wiretap that he would allow Meeks to "work off something" by bringing in this new customer.   (R. 692-2: Call Tr., PageID 11338, 11358).  Later, in coded language, Meeks negotiated the sale of the kilogram of cocaine to his nephew.  (*Id*.).  After confirming the cocaine's quality and availability, Watson and Meeks settled on a price of $32,500 for the kilo.  (*Id*.).

A few days later, the FBI executed 12 search warrants in and around Flint—including at Meeks's house on Garden Street.  (R. 584: Trial Tr., PageID 3555; R. 692–2: Call Tr., PageID 11348; R. 588: Trial Tr., PageID 4442).  In the master bedroom closet of the house on Garden Street, the agents seized over one-half of a kilogram of heroin in separate packages.  (R. 589: Trial Tr., PageID 4676–78). The agents also discovered three blenders, each coated with a powdery residue, as well as common cutting agents for heroin.  (R. 588: Trial Tr., PageID 4446–52).  Blenders are commonly used to break hard chunks of heroin into powder and to blend that powder with a cutting agent.  (R. 587: Trial Tr., PageID 4260).  In addition, the agents found an AK-47 style assault

4

rifle, a detached drum style magazine for the AK-47 loaded with 88 rounds of ammunition, another 500 rounds of ammunition for the AK-47, and a loaded semi-automatic handgun.  (R. 588: Trial Tr., PageID 4443–44, 4452–68).  In a separate office, the agents found photographs of Meeks holding the guns, along with paperwork demonstrating that Meeks used the home.  (R. 588: Trial Tr., PageID 4458–69).

A jury convicted Meeks of conspiracy to distribute more than a kilogram of heroin and five kilograms to cocaine, possession with the intent to distribute more than 100 grams of heroin, possession of firearms in furtherance of drug trafficking crimes, and possession of a firearm by a felon. (PSR ¶ 12). Meeks had an earlier conviction for attempted carrying a concealed weapon and the combination of this criminal history and offense conduct resulted in a guideline range of 121–151 months for the drug counts, consecutive to the five-year mandatory sentence for the conviction for possessing a firearm in furtherance of a drug trafficking crime.  (R. 651: Sent. Tr., PageID 8119).   The district court sentenced Meeks to a total of 181 months' imprisonment—concurrent terms of 121 months for each of the drug counts, another concurrent term of 120 months for the felon-in-

possession count, and a mandatory consecutive term of 60 months for the § 924(c) count.  (R. 647: Judgment, PageID 8090).

Meeks began serving his prison sentence on July 16, 2013 and is currently incarcerated at United States Penitentiary Lewisburg. His projected release date with credit for good time is March 31, 2023. He is 53 years old, moderately obese, and has high blood pressure. Nevertheless, Meeks has asked this Court for compassionate release.

## Argument

## I.   The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

### A.   The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP

6

Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and

7

communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

At Meeks's institution, FCI Lewisburg, the measures taken by the BOP have thus far proven effective. As of October 6, 2020, the staff and inmates that had contracted the virus have recovered; there are no current cases at Lewisburg. https://www.bop.gov/coronavirus/

## B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic.

Coronavirus Aid, Relief, and Economic Security Act (CARES Act)

§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).

The Attorney General has also issued two directives, ordering the

Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the

ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of

Prisons to identify the inmates most at risk from Covid-19 and "to

consider the totality of circumstances for each individual inmate" in

deciding whether home confinement is appropriate. (03-26-2020

Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical.

Over 7700 federal inmates have been granted home confinement since

the Covid-19 pandemic began, and that number continues to grow. BOP

Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts

show that "[t]he system is working as it should": "A policy problem

appeared, and policy solutions emerged." *United States v. Alam*, 960

F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught

committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C.
§ 60541(g)(2).

The Bureau of Prisons must also balance another important
consideration: how likely is an inmate to abide by the CDC's social-
distancing protocols or other Covid-19-based restrictions on release?
Many inmates—particularly those who have been convicted of serious
offenses or have a lengthy criminal record—been already proven
unwilling to abide by society's most basic norms. It is thus important to
evaluate "how . . . released inmates would look after themselves,"
*Wilson*, 961 F.3d at 845, including whether a particular inmate would
adhere to release conditions and social-distancing protocols during the
pandemic. If a prisoner would be unlikely to take release conditions or
Covid-19 precautions seriously, for instance, he would also be far more
likely than the general public to contract and spread Covid-19 if
released.

Finally, the Bureau of Prisons' home-confinement initiative allows it
to marshal and prioritize its limited resources for the inmates and
circumstances that are most urgent. For any inmate who is a candidate
for home confinement, the Bureau of Prisons must first ensure that his

11

proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

12

## II.   The Court should deny Meeks's motion for compassionate release.

Meeks's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

A motion for compassionate release must be denied unless a defendant can show "extraordinary and compelling reasons" for release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711

13

(6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

And even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

## A. Meeks is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus

14

permits a sentence reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

15

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Meeks and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and

16

its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Nor do Meeks's age and medical conditions satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Meeks is 53, an age that does not establish a high risk for severe illness. While the risk for every person of getting severely ill from Covid-19 increases with age, the risk of hospitalization and death is greatest at age 65 and above, with 8 out of 10 deaths resulting from Covid-19 being in adults over 65. *See* CDC: Coronavirus Disease 2019, Older Adults.

Meeks also cites two medical conditions: hypertension and obesity. But neither of them constitute "extraordinary and compelling reasons" for release under USSG § 1B1.13 cmt. n.1. His motion should be denied.

1. Hypertension

Meeks has hypertension. But all hypertension is not the same. Meeks's medical records show that he has essential hypertension. His essential hypertension—also known as high blood pressure—is being treated with medication and as of February 4, 2020, (the last blood

17

pressure reading covered by his medical records) was well controlled[1].

"Pulmonary hypertension," on the other hand, is a type of "serious heart

condition" that places individuals at greater risk, but does not include

"essential (primary) hypertension." CDC: Coronavirus Disease 2019,

Serious Heart Conditions. Essential hypertension is high blood

pressure, does not necessarily increase a person's risk, and is not the

same as "pulmonary hypertension," which is a more serious condition.

Pulmonary Hypertension Association. As such, individuals with

*pulmonary* hypertension have the potential for a more severe form of

Covid-19. Meeks is not at higher risk.

### 2. Obesity

Meeks's medical records show that he is obese, with a body mass

index of 33 in February 2020. The CDC has confirmed that obesity,

defined as a body mass index above 30, is a risk factor that places a

person at increased risk of severe illness from Covid-19. *See* CDC:

Coronavirus Disease 2019, Obesity. Given the heightened risk that

Covid-19 poses to an obese person, this condition satisfies the first

eligibility threshold for compassionate release if it is unlikely the person

---

[1] Blood pressure 123/71.

can recover from it. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A). But Meeks

has gained and lost weight throughout his prison term. In 2016, Meeks

had a BMI of 31 and weighed 221 pounds. At his next doctor's

appointment, he had gained 13 pounds and had a BMI of 33. There is no

reason to believe that Meeks cannot lose this weight and eliminate the

heightened risk he currently faces. Accordingly, Meeks's obesity is not a

medical condition "from which he or she is not expected to recover."

U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). His motion should be denied.

And even if Meeks had met his burden of demonstrating

"extraordinary and compelling reasons" his motion should be denied for

another reason: he remains ineligible for compassionate release because

he is a danger to the community. Section 1B1.13(2) only permits release

if a "defendant is not a danger to the safety of any other person or to the

community, as provided in 18 U.S.C. § 3142(g)." As with the other

requirements in § 1B1.13, this prohibition on releasing dangerous

defendants applies to *anyone* seeking compassionate release. 18 U.S.C.

§ 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13);

*United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020)

(confirming that a released defendant must "not represent a danger to

the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the defendant's presumption of innocence has been displaced by a guilty plea or jury's verdict and

20

when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. And it bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community.").

Because Meeks's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Meeks was caught with more than a pound of heroin. Based on this alone, the Court should deny Meeks's motion. But the risk to the community posed by Meeks goes beyond the general dangers of drugs and addiction. Meeks protected his drug stash with guns and the risk to the community if he were to be released is compounded by the weapons he illegally possessed: an assault style rifle, with a barrel drum and more than 500 rounds of ammunition, and a loaded pistol. His prior weapons conviction and sentence for an offense Meeks committed well into adulthood did not prevent Meeks from dealing drugs and protecting his

drug business with guns. This constellation of offenses is among the most dangerous. And while many defendants can credibly claim to have aged out of their criminality, Meeks sold drugs and possessed guns illegally into his forties. The danger that he would do so again remains. Therefore, Meeks is not eligible for compassionate release.

## C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v.*

*Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Meeks eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Meeks's offense was a serious one. The pound of heroin he intended to distribute would have helped fuel what was then a just-developing opioid epidemic; an epidemic that continues to plague our country even now, in the midst of a global pandemic.[2]  Further, he kept his loaded pistol near his drugs, "which is one consideration indicating it was readily available for use." *United States v. Mendizabal*, 214 Fed.Appx. 496, 501 (2006).  And similarly, although the AK-47 itself was unloaded, its magazine was loaded with 88 rounds of ammunition and was located within two feet of the rifle.  (R. 588: Trial Tr., PageID 4454). The nature of this offense alone warrants a serious and continued punishment.

Meeks's history does not suggest otherwise.  He has prior misdemeanor assault convictions and a felony weapons offense. (PSR - ¶¶ 36-39). And within two years of being discharged from the term of

---

[2] *See* ABC News, Officials worry of potential spike in overdose deaths amid COVID-19 pandemic, April 15, 2020, https://abcnews.go.com/US/officials-worry-potential-spike-overdose-deaths-amid-covid/story?id=70149746 (accessed May 13, 2020 at 2:45PM)

probation he received for his weapons offense, Meeks was conspiring to deal drugs and was again in possession of firearms.  Compassionate release in this case would not satisfy the goals of section 3553—even in the context of the Covid-19 pandemic.

## III.  If the Court were to grant Meeks's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Meeks's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Meeks's motion should be denied.

Dated:  October 6, 2020

MATTHEW SCHNEIDER
United States Attorney

s/ CRAIG F. WININGER
Assistant United States Attorney
211 Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9569
craig.wininger@usdoj.gov
P57058

## <u>CERTIFICATION OF SERVICE</u>

On October 6, 2020, an employee of the U.S. Attorney's Office filed the

above document with the Clerk of the Court using the ECF system.

<u>s/ CRAIG F. WININGER</u>
Assistant United States Attorney